IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

FILED
SEP 1 4 2018

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **UNDER SEAL** |
| v. | ) | |
| | ) | Criminal Case No. 1:18-MJ-441 |
| AIDRISS SAID SAYDI | ) | |
| a/k/a "Drizzy," | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

I, Andrew B. Lenhart, Special Agent with the Federal Bureau of Investigation ("FBI"), Washington Field Division, being duly sworn, depose and state the following:

### I. INTRODUCTION

1. This affidavit is submitted in support of a criminal complaint and arrest warrant charging AIDRISS SAID SAYDI, also known as "Drizzy," with knowingly, intentionally, and unlawfully combining, conspiring, confederating, and agreeing with each other, as well as others, known or unknown, to distribute a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

2. This affidavit is for the limited purpose of obtaining a criminal complaint and arrest warrant. It is not intended to include each and every fact and matter observed by me or known to the government.

1

## II. AFFIANT'S EXPERIENCE

3. I have been a Special Agent with the FBI since 2003. I am presently assigned to the FBI's Washington Field Division, where I investigate white-collar crimes and drug offenses. As a Special Agent of the FBI, I am empowered by law to conduct investigations, make arrests, and execute and serve search and arrest warrants for offenses enumerated in Titles 18 and 21 of the United States Criminal Code, including offenses involving conspiracies to obtain and distribute pills containing oxycodone and other drugs, including heroin, cocaine, Xanax, and marijuana in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

4. Title 21, Code of Federal Regulations, Section 1308.12(b)(1)(xiii) specifies that cocaine is a Schedule II controlled substance. According to the Drug Enforcement Agency's scheduling parameters and under Title 21 United States Code, Section 812, Schedule II controlled substances have currently acceptable uses in treatment for medical issues in the United States, but they are subject to comprehensive restrictions and regulations because of the significant potential for abuse, which may lead to serious psychological and/or physical dependence

5. Title 21, United States Code, Section 841(a)(1) prohibits any person from knowingly or intentionally manufacturing, distributing, or dispensing, or possessing with intent to manufacture, distribute, or dispense, a controlled substance.

6. Title 21, United States Code, Section 846 prohibits any person from attempting or conspiring to commit any offense in the same subchapter, including those described in Section 841(a)(1).

2

### III. PROBABLE CAUSE

7. The facts and information contained in this affidavit are based upon my personal knowledge of the investigation and observations of other officers and agents involved in the investigation. All other observations were related to me or to law enforcement by the persons who made such observations. This is a joint investigation conducted by other law enforcement agencies, including members of the Fairfax County Police Department, the Loudoun County Sheriff's Department, the Prince William County Police Department, the Alexandria City Police Department, and the Arlington City Police Department.

8. The evidence in support of the complaint includes statements provided to law enforcement agencies by the defendants, co-conspirators, cooperators, video surveillance; the Virginia Prescription Monitoring Program ("VPMP"); incident reports from law enforcement agencies; and physical surveillance by law enforcement. During this investigation, the FBI and local law enforcement have used various investigative techniques, including—but not limited to—confidential informants, surveillance, recorded jail conversations, toll records, pen registers, Global Positioning System ("GPS") phone tracking, forensic extractions of cell phones, search warrants, controlled purchases of contraband, police reports, and the use of an undercover Agent.

#### Background

9. Beginning in or about May 2011 through in or about May 2018, AIDRISS SAID SAYDI was identified as the leader of a conspiracy who distributed large quantities of cocaine, marijuana, oxycodone, and Xanax, recruited members of the conspiracy to receive shipments

through the mail of cocaine and marijuana from California, Nevada, New York, and Florida, directed members of the conspiracy to transport cocaine and marijuana overland and by airplane from California and Nevada, used violence and threats of violence to control co-conspirators, used a firearm in the commission of drug crimes, laundered monetary proceeds from drug distribution, and benefited from the financial and drug proceeds of the aforementioned conspiracies. In 2017, SAYDI was identified to your affiant by Unindicted Co-Conspirator-30 (UCC-30) as a drug competitor of Ahmad Sayed Hashimi, a subject of FBI investigation who was eventually convicted at trial of drug conspiracy, interstate domestic violence and kidnapping charges in the District Court for the Eastern District of Virginia in September 2016.

10. In May 2016, your affiant was contacted by an FBI Agent of the Richmond Division whose Confidential Human Source (CS-1) had knowledge of persons involved in a conspiracy to distribute narcotics in the Springfield and Alexandria areas, within the Eastern District of Virginia.

11. On or about May 26, 2016, your affiant interviewed CS-1. CS-1 identified SAYDI's brother in law Omed Husseinkhel as a person involved with others in the illegal distribution of cocaine, marijuana, oxycodone pills, ketamine pills, and ecstasy pills within the Eastern District of Virginia. CS-1 stated that Husseinkhel told CS-1 that SAYDI was a major drug dealer in the D.C. metro area who was involved in distributing large quantities of marijuana and other drugs.

12. Additional investigation since May 2016 led to the identification of over fifty co-conspirators. Some of these co-conspirators were previously known to your affiant through other investigations, including the investigation of Hashimi. Approximately ten controlled purchases from the members of the conspiracy have been conducted since July 2016. These controlled purchases have acquired oxycodone pills, cocaine, morphine pills, fraudulently obtained iPhones,

cannabis oils, and a firearm all within the Eastern District of Virginia. One of the controlled purchases was conducted at SAYDI's residence from one of SAYDI's drug subordinates at SAYDI's direction in SAYDI's presence.

13. On April 23, 2018, United States Magistrate Judge Theresa Carroll Buchannan issued arrest warrants for Omed Husseinkhel, Wassim Banihashemi, and Timothy Darren Proctor with knowingly, intentionally, and unlawfully combining, conspiring, confederating, and agreeing with each other, as well as others, known or unknown, to distribute a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance, Sections 841(a)(1) and 846. Banihashemi and Husseinkhel, known co-conspirators of SAYDI, were taken into custody on April 25, 2018 by Agents of the FBI and eventually pleaded guilty in June 2018.

14. On or about April 25, 2018, as a result of the arrests of Banihashemi and Husseinkhel, SAYDI directed Unindicted Co-Conspirator 15 (hereinafter referred to as "UCC-15"), to hide and bury approximately 1 kilogram of cocaine, approximately 35 pounds of marijuana, and a Berretta 9mm handgun that SAYDI was keeping at his residence. SAYDI directed UCC-15 to do this because SAYDI was fearful the FBI was coming to arrest him next and did not want to possess the contraband as evidence. SAYDI was informed that the FBI was asking questions about his criminal activities through conversations and phone calls received from Husseinkhel's sister, who also happens to be SAYDI's ex-wife, and Banihashemi's girlfriend.

**Overview of the Conspiracies**

15. Beginning in mid-2016 through in or about March 2018, SAYDI and others knowingly, intentionally, and unlawfully combined, conspired, confederated, and agreed with one another and with others to distribute cocaine, oxycodone, marijuana, and Xanax to individuals residing in the Eastern District of Virginia. The conspiracy appears to include at least fifty individuals.

16. SAYDI has been identified as a significant source of cocaine and marijuana, as well as a source of oxycodone and Xanax in the D.C. metropolitan area. According to witnesses, SAYDI has lead an extensive drug organization for approximately ten years. As a result of further investigation, SAYDI was identified as a somebody who directed his subordinates to facilitate drug transactions of cocaine, oxycodone, Xanax, and marijuana, transport cocaine and marijuana, conceal cocaine, marijuana, oxycodone pills, and a firearm from law enforcement; used a firearm in relation to a drug crime; conducted bank transactions in support of drug crimes, structured bank deposits to avoid reporting requirements, and benefited from the financial and drug proceeds of the aforementioned conspiracies. In addition to drug conspiracy charges, SAYDI faces violations of Title 18 United States Code 924(c); Use of a Firearm in support of a drug crime; Title 18 United States Code 1956 and 1957; Money Laundering; and Title 31 United States Code 5324(a)(3), Structuring Transactions to Evade Reporting Requirements.

## Drug Trafficking Conspiracy

### CS-1

17. Information in this affidavit was obtained with the assistance of confidential source 1 (hereinafter referred to as "CS-1"), who has been interviewed by law enforcement over sixty

6

times between June 2016 and May 2018. Law enforcement used several means to corroborate the information provided by CS-1, including confidential informants, physical surveillance, audio/video surveillance, and documents. CS-1 has no pending charges in the Eastern District of Virginia. CS-1 has received monetary rewards for providing information in connection with this cases and other cases in the past. In sum and substance, the information provided by CS-1 is related below.

18. Between July 2016 and September 2016, CS-1 conducted four controlled purchases directly from Husseinkhel at the direction of the FBI. Three of these controlled purchases acquired oxycodone pills among other contraband. Husseinkhel also facilitated CS-1's introduction to Banihashemi for the purpose of purchasing drugs from Banihashemi. As a direct result of the introduction, CS-1 participated in five additional controlled purchases of narcotics from Banihashemi. These controlled purchases from Banihashemi were used to obtain oxycodone pills and cocaine, as further evidence of the drug conspiracy.

19. In approximately January 2017, Husseinkhel introduced CS-1 to SAYDI at a gas station in Springfield, VA. Husseinkhel told CS-1 that UCC-17, owed SAYDI $60,000 for a drug debt. SAYDI believed UCC-17 was cooperating with law enforcement and offered a female $1000 to lure UCC-17 into a hotel room so SAYDI and his entourage could "jump him" and cause him physical harm as pay back for the unpaid debt.

### CS-2

20. Information in this affidavit was obtained with the assistance of confidential source 2 (hereinafter referred to as "CS-2"), who has been interviewed by law enforcement over twenty-five times between August 2017 and June 2018. Law enforcement used several means to

corroborate the information provided by CS-2, including confidential informants, physical surveillance, recordings of jail conversations, audio/video surveillance, and documents. CS-2 has no pending charges in the Eastern District of Virginia. CS-2 has pending charges in Fairfax County related to this case and is hoping to receive consideration for cooperation. In sum and substance, the information provided by CS-2 is related below.

21. CS-2 has known SAYDI since approximately 2012. According to CS-2, SAYDI has been the most prolific drug dealer in the D.C. metropolitan area since CS-2 has known him. SAYDI has never derived income from any legitimate sources besides the trafficking of drugs. SAYDI originally made his drug money by distributing large volumes of marijuana that was sent from his suppliers in California to the addresses of his "workers" in Virginia. The "workers" would allow their addresses to be used for a fee in some cases. In other cases they would keep some of the marijuana as payment. In even other cases they would sell they marijuana for SAYDI and return the profits to him. Sometime in 2016, CS-2 became aware that SAYDI was selling cocaine. SAYDI told CS-2 he could make more money selling cocaine. SAYDI told CS-2 that he made 2.5 million dollars in drug profits in 2017. CS-2 explained that SAYDI keeps people close to him to act as his assistants or right hand people. These persons are directed by SAYDI to conduct the actions and operations of his criminal enterprises. In the past, Banihashemi and an individual identified herein as unindicted coconspirator 19 (UCC-19) have served in these roles to SAYDI. Currently, UCC-15 has been acting in the role of his right hand man. SAYDI directs UCC-15 to sell drugs, deliver drugs, collect drug proceeds, hide drugs, hide firearms, and hide money. SAYDI controls UCC-15 with drugs and violence.

22. SAYDI is also involved in trafficking Xanax and oxycodone pills. SAYDI told CS-2 that he used to receive 1,000 oxycodone pills per week in the mail from California. CS-2 has seen SAYDI in possession of an envelope containing what he/she estimated were approximately 1,000 Xanax pills. UCC-21, UCC-15, and UCC- UCC-29 are involved with SAYDI and others in getting prescriptions from a doctor for Xanax, Adderall, and Promethazine-Codeine and selling them for profit. The doctor who prescribes the medication allegedly will write prescriptions for non-legitimate medical purposes.

23. On August 22, 2017, CS-2, at the direction of the FBI, met with SAYDI at a residence known to law enforcement in Woodbridge, VA to purchase the illicit drug cocaine. The controlled purchase was surreptitiously audio recorded by the FBI. At approximately 7:15 p.m., while under law enforcement surveillance, CS-2 arrived in the cul-de-sac adjacent to the residence, parked his/her vehicle, and entered the residence. FBI Agents and task force officers monitored a live transmitter while CS-2 was inside the residence. CS-2 was greeted at the door by SAYDI and SAYDI's minor child. CS-2 told SAYDI that he/she wanted to "get right" which is coded language meaning, "I want to buy cocaine." According to CS-2, SAYDI pointed to UCC-15 and directed UCC-15 to go get the cocaine. CS-2 motioned to UCC-15 for 2 grams of cocaine and provided UCC-15 with $200. UCC-15 left the room briefly before returning with a small plastic bag of white powder and $40. CS-2 witnessed UCC-15 provide SAYDI with the $160 cash for the transaction. At approximately 7:36 p.m., CS-2 exited the residence, and drove to the pre-determined rally point under law enforcement surveillance. Following the controlled purchase, the FBI recovered from CS-2 a small clear baggy containing approximately 2 grams of white

chunky powder that field tested positive for cocaine. This item was sealed by your affiant and submitted as evidence at the FBI office in Manassas, VA.

24. On May 23, 2018, CS-2, contacted SA Lenhart and reported that SAYDI accused UCC-15 of stealing over $100,000 worth cocaine and marijuana. The drugs came up missing from the spot where UCC-15 had hidden it at the direction of SAYDI. SAYDI became extremely angry and was beating and cutting UCC-15 as punishment. UCC-15 "ran away" from SAYDI late in the night of Saturday May 19, 2018.

### CS-3

25. Information in this affidavit was obtained with the assistance of confidential source 3 (hereinafter referred to as "CS-3"), who has been interviewed by law enforcement over ten times between May 2018 and September 2018. Law enforcement used several means to corroborate the information provided by CS-3, including confidential informants, physical surveillance, recordings of jail conversations, and documents. CS-3 is facing unrelated state charges and may be seeking potential credit in that case for serving as a witness in this federal investigation. In response to credible safety concerns regarding SAYDI, law enforcement has provided emergency housing assistance to CS-3. In sum and substance, the information provided by CS-3 is related below.

26. CS-3 met SAYDI through UCC-15 who lived with SAYDI in a single family residence known to law enforcement in Woodbridge, VA. CS-3 came to the residence Woodbridge Va to visit UCC-15 approximately ten times between March 2017 and February 2018. CS-3 witnessed drug distribution by SAYDI and UCC-15 at the residence. It was obvious to CS-3 that SAYDI was a drug dealer. He had a nice house and possessions and never worked.

SAYDI was in possession of large quantities of drugs. People were always coming and going. Some of these people included, UCC-29, Banihashemi, UCC-23, UCC-25, and many others who CS-3 did not know. CS-3 witnessed UCC-15, SAYDI and others abuse cocaine, Xanax, marijuana, and oxycodone 30 mg pills at the residence that was provided to them by SAYDI. On one occasion, CS-3 saw an approximately sized 8 inch by 8 inch plate with a fist sized block of cocaine powder in the middle of it. Several people were using and abusing it. SAYDI's young daughter was present during these events when drug use was out in the open. SAYDI provided CS-3 with oxycodone 30 mg pills on approximately two occasions. SAYDI also provided Xanax pills to CS-3.

27. UCC-15 was SAYDI's drug distributor and main assistant. CS-3 and UCC-15 fought over UCC-15's loyalty to SAYDI. UCC-15 told CS-3 that he was "in deep" with SAYDI and could not get away from him. SAYDI controlled UCC-15 with violence. UCC-15 told CS-3 that SAYDI brutally beat UCC-15 and put a gun to his head to control him. SAYDI and UCC-15 and SAYDI received prescriptions for Xanax from a doctor whose name is known to law enforcement but who herein is identified only as Dr. G.P. These prescriptions were filled by UCC-15 but the pills were given to SAYDI.

### UCC-17

28. Information in this affidavit was obtained with the assistance of Unindicted Co-Conspirator 17 (hereinafter referred to as "UCC-17"), who was interviewed by law enforcement twice in June 2018. Law enforcement used several means to corroborate the information provided by UCC-17, including confidential informants, physical surveillance, recordings of jail

11

conversations, audio/video surveillance, and documents. UCC-17 has no pending charges in the Eastern District of Virginia. UCC-17 has pending charges in Fairfax County related to this case and is hoping to receive consideration for cooperation. In sum and substance, the information provided by UCC-17 is related below.

29. UCC-17 has known SAYDI since they were children. According to UCC-17, SAYDI is a major drug dealer in the DC metropolitan and northern Virginia area. UCC-17 also stated that SAYDI has made millions of dollars selling marijuana and cocaine over the past several years. UCC-17 was formerly a conspirator/worker for SAYDI. UCC-17 was SAYDI's right hand man for several years in SAYDI's drug operation.

30. In 2017, SAYDI lived in a single family home in a neighborhood in Woodbridge, VA. SAYDI is currently living in an apartment in Alexandria, Virginia. His current business partner and right hand man is UCC-15. UCC-15 moves, sells, packages, and hides drugs at SAYDI's direction. UCC-15 moves and hides money at SAYDI's direction. SAYDI controls UCC-15 in part by "feeding" or providing him drugs to which he is addicted. UCC-15 does not profit financially from SAYDI's drug organization. SAYDI and UCC-15 abuse oxycodone, cocaine, and Xanax.

31. SAYDI has a relative, hereinafter referred to as UCC-26 who made flights from Las Vegas, Nevada (NV) to a small airport in Fredericksburg, VA to deliver large bundles of marijuana to SAYDI at SAYDI's direction. Between 2013 and 2015 UCC-26 flew approximately 20 shipments of marijuana. UCC-26 was paid $20,000 to $30,000 per flight by SAYDI. Each

flight transported approximately 400 pounds of marijuana. SAYDI eventually accused UCC-26 of stealing from him and stopped using him.

32. For the past approximately two years the marijuana has been shipped by Fed-EX to Virginia or smuggled by "asteroids" on commercial flights in suitcases into BWI airport. UCC-17 described "asteroids" as females they hired to fly to CA to pick up the drugs and carry them in suitcases in flights back to the DC metro area. One of the females was a Hispanic female, UCC-39. Another female, UCC-25 was also used by SAYDI to smuggle drugs and assist him with his drug conspiracy. UCC-25 was also involved in procuring Promethazine Codeine and Xanax for herself and SAYDI.

33. SAYDI traveled extensively to Miami, FL and took many of his entourage with him on occasions including UCC-18 and UCC-19. SAYDI is also known to drive a Lamborghini sports car. SAYDI's Miami cocaine sources are white and hispanic males. SAYDI beat UCC-19 and controlled UCC-19 with violence.

34. In approximately the fall of 2016, UCC-17 witnessed UCC-24 with cutting and compressing a kilogram of cocaine at SAYDI's residence. SAYDI obtained this cocaine from UCC-32 in California.

35. SAYDI provided a gram of cocaine to UCC-17 at least 50 separate times. UCC-17 has witnessed SAYDI distribute cocaine to UCC-23, UCC-33, and others. These were all amounts of cocaine in excess of an ounce and were redistributed by the aforementioned persons. UCC-33 sold a lot of SAYDI's cocaine on a regular basis.

**UCC-15**

36. In the early morning of May 20, 2018, SA Lenhart was contacted by Fairfax County Police Detective Walt Fasci to report the UCC-15 had turned himself into police and was seeking protective custody. SA Lenhart and Detective Fasci obtained the following information which was provided by UCC-15 in four separate interviews conducted between May 20 and June 8, 2018. UCC-15 has known SAYDI for approximately seven years. SAYDI is one of the biggest drug dealers in the D.C. metro area. SAYDI has been a major drug dealer since UCC-15 has known him. SAYDI is a supplier of marijuana and cocaine to MS-13 and the Reccless Tigers gangs. SAYDI had a press at the Millet Street residence that he used to cut and compress cocaine. SAYDI cut cocaine with crushed Tylenol pills. SAYDI's primary source of drugs, including both marijuana and cocaine, is currently located in California. All the packages are currently shipped by Fed-EX to Las Vegas. After they are repackaged in Las Vegas, they are shipped to Virginia to different residences of SAYDI's co-conspirators. Before SAYDI began shipping the drugs to Virginia, they were brought in by paid smugglers or "Mules." Most of these "mules" were females that smuggled drugs in suitcases on commercial lights from California to Virginia. Sometimes larger amounts were driven to Virginia from California. UCC-19 carried a suitcase containing $500,000 cash on a plane to CA to purchase marijuana. The drugs purchased from this particular transaction were shipped to the residence of an individual identified herein as unindicted coconspirator 18 (UCC-18). A single transaction involving 1,400 pounds of marijuana was driven to Virginia from California in a trailer pulled by a car. For a brief period of time, SAYDI's drugs were flown from Las Vegas to a small airport in Fredericksburg, VA by an individual identified previously as unindicted coconspirator 26 (UCC-

14

26). He was paid $25,000 per flight. SAYDI thought UCC-26 was stealing some of the drugs from him and fired him.

24. UCC-15 has been "working" for SAYDI for approximately the past eighteen months as his right hand man. In approximately January 2017, UCC-15 moved in with SAYDI at an address known to law enforcement in Woodbridge, VA. SAYDI directed UCC-15 to distribute drugs on his behalf, collect and handle money, and deposit money in various bank accounts. SAYDI directed UCC-15 to deposit $25,000 to $35,000 in bank accounts over a 2 to 3 month period. These deposits were usually made in $5,000 to $7,500 increments to avoid bank and law enforcement suspicions. SAYDI is very controlling and uses violence to control and intimidate UCC-15 and others. SAYDI hit UCC-15 across the side of the face with a handgun in January 2018 because UCC-15 would not brandish a weapon during a drug deal with UCC-27. Banihashemi and SAYDI are very close. Banihashemi provided oxycodone pills to SAYDI and UCC-15 on a regular basis. From August 2017 through February 2018, Banihashemi provided at least 300 to 400 oxycodone 30 mg pills to SAYDI over the six month period. SAYDI distributed oxycodone 30 mg pills to UCC-15 and CS-3.

25. Over the course of over the past year, UCC-15 was directed by SAYDI to distribute at least 1 kilogram of cocaine every 2 months, in addition to hundreds of pounds of marijuana that was distributed for profit as part of SAYDI's criminal enterprise. SAYDI was already distributing kilograms of cocaine before UCC-15 became his "right hand man." SAYDI's previous "right hand man" before UCC-15 was UCC-31. The cocaine as well as marijuana was distributed by UCC-15 and SAYDI to the following people in "ounce

quantities" for redistribution: UCC-22, UCC-33, UCC-34, UCC-35, UCC-36, UCC-37, and Wassim Banihashemi.

26. In the late morning of April 25, 2018, UCC-15 was inside the residence at 5571 Vincent Gate Terrace, Unit 1334, Alexandria, VA, where he lived with SAYDI, when SAYDI was contacted on the phone by his ex-wife, who called to tell SAYDI that her brother Omed Husseinkhel had been arrested by the FBI at her parent's residence. SAYDI and UCC-15 got in SAYDI's black Dodge Minivan and drove to Advance Auto Group in Alexandria, VA to find out more information from people at the Auto Shop. In the van they had one kilogram of cocaine and approximately 40 pounds of marijuana. They had already been planning on meeting an individual identified herein as unindicted coconspirator 24 (UCC-24) at the shop to distribute some of the marijuana. When they arrived at the shop, an individual identified herein as unindicted coconspirator 11 (UCC-11), Banihashemi's girlfriend, was there. UCC-11 told SAYDI that Banihashemi had also been arrested by the FBI. UCC-11 had also been interviewed by FBI Agents. She and Banihashemi were shown pictures of SAYDI, UCC-19, and many others including UCC-24. SAYDI was contacted again by his ex-wife later in the day. She told him that she found out that after Husseinkhel's arrest, he was also shown pictures and asked questions about SAYDI. The next day, SAYDI told UCC-15 to "get the shit out of the house" and directed UCC-15 to bury the 40 pounds of marijuana, kilogram of cocaine, and a pistol with two magazines. The street value of these items was approximately $180,000. SAYDI asked UCC-15 if he had a good spot to hide the drugs. The location he picked was off a trail adjacent to a neighborhood near the intersection of Edsall Road and Timber Forest Drive. UCC-15 went to the location and buried the marijuana, cocaine, and firearm in a "rush job." Approximately 5 to 6 days later, SAYDI told

UCC-15 to recover the drugs and the gun. When UCC-15 returned to recover the contraband, it was gone. UCC-15 told SAYDI it was gone and brought SAYDI to the area to help look for the items. SAYDI was very angry and told UCC-15, "you fucked my whole life up." When they returned to the apartment, SAYDI told UCC-15, "I'm going to beat you every day until you find my drugs." SAYDI beat UCC-15, cut his arms, cut his finger, and burned his hands. Every night they would go out and look for the drugs and dig in the dark. When they would return to the apartment after not finding the contraband, SAYDI beat UCC-15.

27. On approximately May 5, 2018, SAYDI accused UCC-15 of stealing the drugs and keeping them at his girlfriend's residence. SAYDI threatened to kill UCC-15 and his girlfriend if he did not get his drugs back. On Saturday May 19, 2018, SAYDI sent UCC-15 back out in SAYDI's Dodge Caravan at approximately 2 a.m., with a metal detector to try and locate the drugs. SAYDI was watching UCC-15 and may also have had others watching UCC-15. UCC-15 had enough of the beatings and was worried for his life. At approximately 3:00 a.m., when UCC-15 thought it was safe, he contacted Fairfax County Police and told them he was wanted on a warrant out of Prince William County for not paying child support.

28. On June 5, 2018, UCC-15's girlfriend contacted law enforcement and reported that SAYDI had learned where she had been staying and had come there to confront her about the contraband that he was missing.

**Police Report**

29. On June 26, 2018, Detective Michael Ragan of the city of the Prince William County Police Department provided your affiant with an incident report from a January 12, 2018

17

incident involving SAYDI and UCC-15 at the residence where they were living at in Woodbridge, VA. Prince William County Police responded to the residence in conjunction with a report of an opiate overdose by Prince William County Emergency officials at the residence.

30. At approximately 4:40 a.m., Police responded to the Woodbridge, Va residence for an unconscious person later identified as UCC-15. UCC-15 was revived on scene by rescues using 2ml of Narcan and transported to Sentara Hospital. When Detective Ragan arrived on scene, an odor of marijuana was coming from inside the residence. In addition to UCC-15, four other adults inside the residence, including SAYDI were present. All four were uncooperative when asked what had occurred but stated that they were all occupants of the residence. They were also giving conflicting information about UCC-15's home address and whether or not he also had a room in the residence with the odor of marijuana coming from the residence, all occupants were detained for the purpose of applying for a search warrant. A safety search was conducted and during the safety sweep of the seating area where the occupants were going to be seated, a glass-smoking device with suspected marijuana residue was located. During the safety sweep of the residence to further secure the residence, located within plain view and in what appeared to be the master bedroom, several prescription pill bottles with faded or removed stickers, one pill bottle containing marijuana and items supporting marijuana use. The room where these items were located was equipped with a security system on the door to notify any entrance into the room as well as a security camera that was pointed toward the bedroom door.

31. Located in SAYDI's room of the residence, on the top left of a night stand on the left side of the bed, was a pill bottle with a dollar bill with a white powdery substance on it. In the bottom drawer of the same nightstand were 9 unknown off white pills wrapped in a clear

18

plastic baggie. In SAYDI's bathroom, connected to the main room was Adderall that belonged to UCC-15. In the closet connected to the bathroom was a green metal pill canister that containing a white powdery substance. Located in the back bedroom in the nightstand to the right of the bed, were 2 pill bottles with a white powdery residue and a straw. In summary, according to Ragan, in addition to the pills recovered, approximately 11 grams of powder cocaine was recovered from SAYDI's room at the residence.

**SAYDI Employment Queries**

32. In August 2017 an official request was made by the FBI to the Virginia Employment Commission (VEC) seeking official wage and income data for AIDRISS SAID SAYDI for the time period of August 2012 through August 2017. The official response from VEC returned no record of income for SAYDI.

**CONCLUSION**

33. Based on the information provided in this affidavit, probable cause exists to believe that from in or about January 2016 through in or about March 2018, within the Eastern District of Virginia, AIDRISS SAID SAYDI also known as "Drizzy," did knowingly, intentionally, and unlawfully combine, conspire, confederate, and agree with others, known and unknown, to distribute a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

34. Wherefore, I respectfully request that this Court issue a criminal complaint and arrest warrant charging AIDRISS SAID SAYDI, also known as "Drizzy," with violations of Title 21, United States Code, Sections 841(a)(1) and 846, and a warrant authorizing his arrest.

Andrew B. Lenhart
Special Agent, FBI

Sworn and subscribed to before me this 14
day of September, 2018, at Alexandria, Virginia.
_____/s/_____
Michael S. Nachmanoff
The Honorable Michael S. Nachmanoff
United States Magistrate Judge

20